KAREN P. HEWITT
United States Attorney
RAVEN NORRIS
Assistant U.S. Attorney
California State Bar No. 232868
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone:  (619) 557-7157
E-mail: Raven.Norris@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MOHAMED BAHRIZ | ) | Case No. 08cv0342-JM (NLS) |
| | ) | |
| Petitioner, | ) | |
| | ) | TABLE OF CONTENTS FOR EXHIBITS IN |
| v. | ) | SUPPORT OF GOVERNMENT'S MOTION TO |
| | ) | DISMISS OR ALTERNATIVELY TO |
| PAUL PIERE, District Director, U.S. | ) | REMAND TO THE UNITED STATES |
| Citizenship & Immigration Services, et al. | ) | CITIZENSHIP AND IMMIGRATION |
| | ) | SERVICES |
| Defendants | ) | |
| _____ | ) | |

| Exhibits | | Pages |
|---|---|---|
| Exhibit A: | Declaration of Celia Kynoch | 12-20 |
| Exhibit B: | Fact Sheet-Immigration and Security Checks | 21-24 |
| Exhibit C: | News Release-USCIS and FBI Joint Plan to Eliminate Backlog | 25-26 |
| Exhibit D: | News Release-USCIS Updates Projected Naturalization Case Processing Time | 27-28 |
| Exhibit E: | Declaration of Michael A. Cannon | 29-46 |
| Exhibit F: | Order Vacating Hearing and Remanding Adjudication of Naturalization Hearing | 47-53 |
| Exhibit G: | Order Granting Defendant's Motion to Dismiss Plaintiff's Complaint | 54-61 |

1   KAREN P. HEWITT
     United States Attorney
2   RAVEN NORRIS
     Assistant U.S. Attorney
3   California State Bar No. 232868
     Office of the U.S. Attorney
4   880 Front Street, Room 6293
     San Diego, California 92101-8893
5   Telephone: (619) 557-7157
     E-mail: Raven.Norris@usdoj.gov
6
     Attorneys for Defendants
7

8                 UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF CALIFORNIA
9

10   MOHAMED BAHRIZ           )     Case No. 08cv0342-JM (NLS)
                        )
11            Plaintiff,      )
                        )     Declaration of Celia Kynoch
12       v.                  )
                        )
13   PAUL PIERRE, District Director, U.S. )
     Citizenship & Immigration Services, et al. )
14            Defendant.      )
                        )
15

16

17

18

19

20

21                           EXHIBIT A

22

23

24

25

26

27

28

DECLARATION OF CELIA KYNOCH

I, Celia Kynoch, do hereby declare and say:

1.      I am employed by the U.S. Department of Homeland Security ("DHS") and assigned to the San Diego District of the U.S. Citizenship and Immigration Service (USCIS) in San Diego, California, as the San Diego District Resolution Officer. Under the scope of my duties, I routinely access a variety of computer systems to research and monitor case records and monitor disputes registered at the administrative level regarding, among other things, Applications for Adjustment of Status to Lawful Permanent Residency and Applications for Naturalization.

2.      This declaration is submitted in support of Defendants' Motion to Dismiss in the case of Bahriz v. Mukasey, 08 CV 0342, currently pending in the Southern District of California. This declaration provides a factual summary of the agency's adjudication policy as well as a review of the plaintiff's file. The information below is based upon review of the files, electronic records, personal knowledge, and other information that has become known to me in the course of my official responsibilities concerning the processing of this application.

3.      I have reviewed the administrative file of the male plaintiff, Mohamed Bahriz, and thus am familiar with the facts and circumstances of his case.

4.      Mohamed Bahriz, Plaintiff, born on October 19, 1971, is a native and citizen of Algeria. On May 23, 2001, his status was adjusted to that of a Lawful Permanent Resident (LPR) of the United States on the basis of his marriage to a U.S. Citizen.   As a result of his marriage, Mr. Bahriz was eligible for naturalization three years after his adjustment to LPR.  Mr. Bahriz submitted his first application for naturalization on March 29, 2004. On or about April 4, 2004, the FBI received a name check request from USCIS and on October 2, 2004, the FBI completed the name check request. Following receipt of the completed namecheck, USCIS scheduled Mr. Bahriz for an interview on October 22, 2004.   After completing the interview, Mr. Bahriz withdrew his application for naturalization. Subsequently, on March 23, 2006, Mr. Bahriz filed a second N-400 Application for Naturalization with the California Service Center, which is the basis for the district court action.

///

///

1      5.      In Fiscal Year 2007 USCIS received nearly 1.4 million applications for naturalization,

2  nearly double the volume received the previous fiscal year.  For the months of June and July 2007

3  USCIS received a 350 percent increase in N-400 applications compared to the same period in 2006.

4      6.      When a visa petition or other application seeking an immigration benefit on behalf of an

5  alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security

6  background checks.  These checks are conducted both to enhance national security and ensure the

7  integrity of the immigration process. These security and background checks serve to screen out aliens

8  who may seek to harm the United States and its citizens or who may be seeking immigration benefits

9  improperly or fraudulently. These security checks have yielded significant derogatory information about

10  alien applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and

11  individuals with known links to terrorism.  This has resulted in the alien being found ineligible for the

12  immigration benefit and USCIS's denial of the application or petition.  Where applicable, the

13  information has also resulted in aliens being arrested by law enforcement agencies or charged under

14  removal grounds and deported from the United States.

15      7.      The attached Fact Sheet explains the different types of checks that must be completed.

16  A true and correct copy of the USCIS Fact Sheet is attached hereto as Exhibit B.  The checks include

17  the FBI Name Check, FBI fingerprint check, and the DHS-managed Interagency Border Inspection

18  System (IBIS).  The records maintained in the FBI name check process consist of administrative,

19  applicant, criminal, personnel and other files compiled by law enforcement agencies that contain

20  information that is not necessarily revealed by the FBI's fingerprint check or IBIS.  Although in the

21  majority of FBI name checks no matches are found, some cases involve complex or highly sensitive

22  information and cannot be resolved quickly.  The IBIS system contains records and information from

23  more than 20 federal law enforcement and intelligence agencies including the Central Intelligence

24  Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS

25  Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central

26  system that combines information from these various sources and databases to compile information

27  regarding national security risks, public safety concerns, and other law enforcement concerns.  IBIS

28  provides, but is not limited to, information related to persons who are wanted criminals, persons of

1   interest in the context of national security, and other derogatory information, including adverse
2   immigration history.

3       8.      While the results of an IBIS query are usually available immediately, in some cases
4   information found will require further investigation. Finally, FBI fingerprint checks provide information
5   relating to criminal background within the United States. Results are usually received within days and
6   while the vast majority result in no criminal record, positive results may have a direct bearing on the
7   eligibility of an applicant for the immigration benefit being sought. If a background or security check
8   reveals derogatory information on the alien (i.e. "a hit"), the USCIS works with other divisions within
9   the DHS and/or other law enforcement and/or intelligence agencies, as necessary, to obtain all available
10  information concerning the derogatory record.

11      9.      Although an alien's immigration file may reflect that an FBI fingerprint check was
12  conducted, these checks frequently do not reveal the types of derogatory information described above,
13  particularly when it is not information that has resulted in an arrest or criminal conviction. For example,
14  persons on a "watch list" who are suspected of engaging, or having engaged, in terrorist activity, will
15  not necessarily be identified through an FBI fingerprint check, but could be identified through an IBIS
16  record check or an FBI name check of investigation databases.

17      10.     The FBI has an established process of processing FBI Name Check requests from USCIS
18  chronologically based on the date the request is forwarded. Since September 11, 2001, USCIS has
19  submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating
20  a backlog in FBI's performance of complete security checks. During the initial submission period of
21  December 2002 and January 2003, USCIS submitted almost 3 million names to the FBI. As of May
22  2007, USCIS had approximately 329,160 pending FBI Name Check requests with approximately 32
23  percent pending more than one year.

24      11.     Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and
25  thorough background checks on aliens who are seeking immigration status in the United States has
26  required procedures that sometimes result in individuals not receiving their documents and benefits as
27  quickly as in the past. In order to ensure national security and public safety, as well as to reduce the
28  waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ,

1    DHS, FBI, and ICE to develop and implement improved procedures that will ensure that all of the
2    background checks are completed and the results considered as quickly as possible. In fact, on
3    April 2, 2008, USCIS and FBI in an effort to eliminate the backlog of FBI namechecks established a
4    series of milestones prioritizing work based on the age of the pending namecheck. A true and correct
5    copy of the press release outlining the joint plan to eliminate the back log is attached as Exhibit C.
6    However, federal regulations still require USCIS to make certain that all required security checks have
7    been completed before adjudicating any naturalization application.

8        12.    For most applicants, USCIS can quickly determine if there are criminal or security
9    related issues in the applicant's background that affect eligibility for immigration benefits. However,
10   due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await
11   responses from the FBI or other relevant agencies that conduct some of the required security checks,
12   some delays on individual naturalization applications are unavoidable and may be lengthy. Moreover,
13   in some cases a background or security check will reveal that positive (derogatory) information on the
14   subject alien is possessed by some agency other than USCIS without necessarily revealing the substance
15   of that information. In such cases, USCIS works closely with the other law enforcement or intelligence
16   agencies to obtain all available information concerning the positive result in order to properly evaluate
17   its significance. Even where the FBI or a third agency has provided a final response, a case may still be
18   considered pending where the response requires further investigation or review by USCIS or another
19   agency. It is vitally important to thoroughly screen each applicant in order to resolve all concerns of
20   a law enforcement or national security nature before determining that an individual is eligible for an
21   immigration benefit.

22       13.    USCIS will continue to perform any outstanding background and security checks, in
23   cooperation with the FBI, as expeditiously as possible to help ensure that no eligible alien must wait
24   longer than is reasonably necessary to receive a decision on his or her naturalization application.

25       14.    Since only aliens who are lawful permanent residents may apply for naturalization, all
26   applicants for naturalization already have a previously created permanent immigration file (A-file)
27   which houses their application for permanent residence and related files. Once USCIS receives an N-
28   400 Application for Naturalization, the application is keyed in, placed into a receipt folder, a T-file

1  (temporary file) is created and the A-file is requested electronically through the Central Immigration
2  System ("CIS"). The T-file is placed on an N-400 shelf until the A-file is received and the N-400 is then
3  consolidated into the permanent A-file. Much of this initial electronic processing and data entry is
4  automated, including the automatic generation and electronic transmission of a FBI name check request
5  by the CLAIMS 4 (Computer Linked Access Information Management System) via FBIQUERY, the
6  FBI repository and tracking system for FBI Name Check requests. That electronic transmission of the
7  FBI name check request by CLAIMS 4 is done automatically when the N-400 is first received and keyed
8  in at USCIS Service Center and before the N-400 is placed on the N-400 shelf to await completion of
9  all necessary security checks, including the FBI name check.

10       15.    As far as monitoring and tracking of the FBI name checks requested involving aliens who
11  have filed mandamus actions in federal district court, The A-file from the "FBI Name Check" Shelf is
12  transferred to a special "Mandamus Action" shelf, which is subject to my direct supervision and control.
13  Using bar codes and a "wand" type reader to partially automate the process, I personally check the status
14  in the FBIQUERY system of each and every pending mandamus case–including Mr. Bahriz's
15  application on a daily basis. FBI name check requests that have been received by the FBI but have not
16  yet been completed are indicated by a notation of "Pending."   An FBI Name Check that has been
17  completed will be indicated by various entries depending on the result, including No Record, Positive
18  Record, etc.

19       16.    These reports do not provide USCIS with any information as to what information the FBI
20  may have relating to a particular alien, whether an FBI investigation into the particular alien has been
21  undertaken, or whether there are national security concerns relating to that alien. Once a response is
22  received from the FBI, that information is automatically uploaded in CLAIMS 4. Once the FBI name
23  check and other security checks are completed, CLAIMS 4 automatically moves the N-400 into an
24  interview queue. The N-400s then remain in the interview queue to await scheduling of interviews by
25  the district offices.

26       17.    USCIS has a process for expediting processing of certain applications and petitions. It
27  is important to note that whenever a particular application or petition receives expedited processing and
28  is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or

Declaration of Celia Kynoch                          6                                  08cv0342 JM

1   applications that bear an earlier filing date. If, for example, USCIS asks the FBI to expedite a name

2   check in a particular case, this action comes at the expense of other name check cases because the FBI

3   would have fewer resources with which to work other pending cases.

4       18.    In order to address in a consistent and fair manner the increasing number of mandamus

5   actions filed nationwide by aliens awaiting decisions on their petitions and applications, USCIS issued

6   specific guidelines for requesting an expedited name check from the FBI. Expedited processing may

7   be pursued in the following situations: (1) Military deployment; (2) Age-out cases not covered by the

8   Child Status Protection Act and applications affected by sunset provisions such as the Diversity Visa

9   Program; (3) Compelling reasons provided by the requesting office such as critical medical conditions;

10  and (4) Loss of social security benefits or other subsistence at the discretion of the Director.

11      19.    To my knowledge, Mr. Bahriz has not made a formal request for expedited processing.

12  Moreover, USCIS will not routinely request the FBI to expedite a name check when the only reason for

13  the request is that a mandamus (or other federal court petition) is filed in the case.

14      20.    USCIS reports the average processing times for specific applications and petitions on the

15  USCIS website. This information reflects only average processing times on the date the information

16  is published. Average processing times fluctuate widely and will sometimes even regress for a specific

17  form time due to a number of factors, including a reallocation of agency resources, reordering of the

18  agency's priorities, and other reasons. Additionally, not every application will require the same level

19  of inquiry. Some may require a more detailed level of review and or investigation from either the

20  USCIS or other agencies for a number of reasons ranging from the alien's eligibility for the benefit

21  sought to national security concerns. Accordingly, even when it appears that the adjudication of a

22  particular application is outside the average processing time, this does not establish that the delay is

23  unreasonable or even due to factors within the control of the agency. Significantly, USCIS has recently

24  announced that it intends to complete thirty-six percent more naturalization cases than last year and in

25  fact has reduced the projected average processing times for naturalization applications. A true and

26  correct copy of the press release outlining the new processing times is attached as Exhibit D.

27      21.    Moreover, during the continued pendency of a naturalization application, the alien retains

28  all of the rights and benefits of a permanent resident of the United States, including the right to live and

1   work in this country and to travel freely abroad. Thus, applicants for naturalization are not as adversely

2   affected by delays in the adjudication of their applications as are aliens filing for other immigration

3   benefits.

4         22.    On April 12, 2006, a request for a background security name check in connection with

5   Mr. Bahriz's N-400 application was submitted electronically to the FBI in accordance with the above

6   discussed procedures. As of today's date, the results of the name check for the Mr. Bahriz remain

7   pending with the FBI. The FBI fingerprints on the Mr. Bahriz were initiated on April 24, 2006. In

8   continuing to process the application, on April 17, 2008, USCIS scheduled Mr. Bahriz to be re-printed

9   on April 26, 2008. Fingerprints remain valid for a period of 15 months following receipt.

10        23.    In accordance with 8 C.F.R. § 335.2(b), in the absence of a "definitive response" from

11   the FBI with regard to the name check request, Mr. Bahriz may not be scheduled for a naturalization

12   interview and his case remains in a holding status. USCIS initially scheduled Mr. Bahriz for a

13   naturalization interview for October 20, 2006 but in accordance with 8 C.F.R. § 335.2(b), USCIS

14   descheduled Mr. Bahriz's interview.

15        24.    As the situation stands, there are three possibilities: (1) in the very likely event that the

16   FBI name check ultimately clears with a finding of "no record" or "NR", the San Diego District Office

17   will immediately place the application in the electronic queue to be scheduled for interview in the San

18   Diego District Office or the appropriate office on the first available date. We will also immediately

19   transfer the A-file to the place where the interview will be held. (2) In the less likely event that the FBI

20   eventually reports a "positive response" or "PR," significant additional time would likely be required

21   while USCIS learns the precise nature of the positive information and determines whether it would have

22   any bearing on the outcome of the adjudication, and (3) as long as the FBI query continues to return its

23   current response of "pending" or "IP," this agency's hands are tied, and we are unable to move beyond

24   this point.

25        25.    As far as monitoring and tracking of the FBI name checks requested in this particular

26   case, I aver that in March 2008 this A-file was transferred from the "FBI Name Check" Shelf to a

27   special "Mandamus Action" shelf, which is subject to my direct supervision and control. I have

28   personally checked the status in the FBIQUERY system of Mr. Bahriz's application on a daily basis.

1 | USCIS will schedule Mr. Bahriz for an interview and adjudicate his application as soon as possible after

2 | the FBI completes its background checks and information that is received, or has already been received,

3 | from those checks is completely evaluated by USCIS.

4 |      26.    During the continued pendency of his naturalization application, Mr. Bahriz retains all

5 | of the rights and benefits of a permanent resident of the United States, including the right to live and

6 | work in this country and to travel freely abroad.

7 |      I declare under penalty of perjury that based upon reasonable inquiry and to my knowledge,

8 | information and belief, the foregoing to be true and correct.

9 |

10 | Executed this 24 day of April, 2008, at San Diego, California.

11 |

12 | *Celia Kynoch*

13 | CELIA KYNOCH
District Resolution Officer

14 | San Diego District Office, USCIS

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

Declaration of Celia Kynoch                           9                           08cv0342 JM

1  KAREN P. HEWITT
   United States Attorney
2  RAVEN NORRIS
   Assistant U.S. Attorney
3  California State Bar No. 232868
   Office of the U.S. Attorney
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone:  (619) 557-7157
   E-mail: Raven.Norris@usdoj.gov
6
   Attorneys for Defendants
7

8              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA
9

10  MOHAMED BAHRIZ                    )      Case No. 08cv0342-JM (NLS)
                                      )
11               Plaintiff,           )
                                      )      Fact Sheet-Immigration and Security Checks
12        v.                          )
                                      )
13  PAUL PIERRE, District Director, U.S. )
    Citizenship & Immigration Services, et al. )
14               Defendant.           )
                                      )
15  _____ )

16

17

18

19

20

21                          EXHIBIT B

22

23

24

25

26

27

28

*Press Office*
**U.S. Department of Homeland Security**



**U.S. Citizenship and Immigration Services**

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

08cv0342_00022

Immigration Security Checks—How and Why the Process Works

---

### How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

08cv0342_00023

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

08cv0342_00024

1   KAREN P. HEWITT
    United States Attorney
2   RAVEN NORRIS
    Assistant U.S. Attorney
3   California State Bar No. 232868
    Office of the U.S. Attorney
4   880 Front Street, Room 6293
    San Diego, California 92101-8893
5   Telephone: (619) 557-7157
    E-mail: Raven.Norris@usdoj.gov
6
    Attorneys for Defendants
7

8              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF CALIFORNIA
9

10  MOHAMED BAHRIZ                     )      Case No. 08cv0342-JM (NLS)
                                       )
11                    Plaintiff,       )
                                       )      News Release-USCIS and FBI Joint Plan to
12         v.                          )      Eliminate Backlog
                                       )
13  PAUL PIERRE, District Director, U.S.)
    Citizenship & Immigration Services, et al.)
14                    Defendant        )
                                       )
15  _____)

16

17

18

19

20

21                          EXHIBIT C

22

23

24

25

26

27

28



Office of Communications

U.S. Citizenship
and Immigration
Services

# News Release

April 2, 2008

### USCIS AND FBI RELEASE JOINT PLAN TO ELIMINATE BACKLOG OF FBI NAME CHECKS
*Partnership Establishes Series of Milestones To Complete Checks*

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) and the Federal Bureau of Investigation (FBI) today announced a joint plan to eliminate the backlog of name checks pending with the FBI.

USCIS and the FBI established a series of milestones prioritizing work based on the age of the pending name check. The FBI has already eliminated all name check cases pending more than four years.

"This plan of action is the product of a strong partnership between USCIS and the FBI to eliminate the backlogs and to strengthen national security," said USCIS Director Emilio Gonzalez.

By increasing staff, expanding resources, and applying new business processes, the goal is to complete 98 percent of all name checks within 30 days. USCIS and the FBI intend to resolve the remaining two percent, which represent the most difficult name checks and require additional time to complete, within 90 days or less. The goal is to achieve and sustain these processing times by June 2009.

The joint plan will focus on resolving the oldest pending FBI name checks first. USCIS has also requested that the FBI prioritize resolution of approximately 29,800 pending name checks from naturalization applicants submitted to the FBI before May 2006 where the naturalization applicant was already interviewed.

The target milestones for processing name checks are:

| Completion Goal | Category |
|---|---|
| May 2008 | Process all name checks pending more than three years |
| July 2008 | Process all name checks pending more than two years |
| Nov. 2008 | Process all name checks pending more than one year |
| Feb. 2009 | Process all name checks pending more than 180 days |
| June 2009 | Process 98 percent of all name checks within 30 days and process the remaining two percent within 90 days. |

– USCIS –

1  KAREN P. HEWITT
   United States Attorney
2  RAVEN NORRIS
   Assistant U.S. Attorney
3  California State Bar No. 232868
   Office of the U.S. Attorney
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: (619) 557-7157
   E-mail: Raven.Norris@usdoj.gov
6
   Attorneys for Defendants
7

8              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF CALIFORNIA
9

10  MOHAMED BAHRIZ                    )    Case No. 08cv0342-JM (NLS)
                                      )
11            Plaintiff,             )
                                      )    News Release-USCIS Updates Projected
12      v.                            )    Naturalization Case Processing Time
                                      )
13  PAUL PIERRE, District Director, U.S. )
    Citizenship & Immigration Services, et al. )
14            Defendant.             )
                                      )
15  _____ )

16

17

18

19

20

21                     EXHIBIT D

22

23

24

25

26

27

28

*Office of Communications*
**U.S. Department of Homeland
Security**



# News Release

April 2, 2008

## USCIS UPDATES PROJECTED NATURALIZATION CASE PROCESSING TIME
*Agency To Complete 36-percent More Naturalization Cases Than Last Year*

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) announced today that it will finish more than one million naturalization cases during fiscal year 2008 – far exceeding the number of cases completed last year. This update comes following a thorough analysis of the work completed during the last six months.

"By the end of the year, I expect USCIS will have finished 36 percent more naturalization cases than last year without compromising national security or the integrity of the naturalization process," said USCIS Director Emilio Gonzalez.

The agency recently updated the expected time it will take to complete naturalization cases, projecting processing times averaging 13-15 months. That's a three month improvement from the 16-18 month projection that USCIS made six months ago.

A critical component of the strategy for addressing this workload is to quickly grow the capacity to handle the influx of additional cases. That includes expanding the USCIS workforce by adding nearly 3,000 new employees, detailing employees to work in the most heavily affected offices, quadrupling the funding for overtime and using Asylum Office facilities and staff to conduct naturalization interviews.

Last summer, USCIS received an unprecedented number of applications and petitions for immigration benefits. During June, July and August alone, USCIS received nearly three million filings, compared to 1.8 million filings during the same period the previous year. This sudden surge included 1.4 million naturalization applications last year – 460,000 in July alone. While historically filing increases have occurred in advance of fee increases, Presidential elections, immigration debates and new legislation, none of the past increases are close to the magnitude of the last summer's surge.

– USCIS –

08cv0342_00028

1    KAREN P. HEWITT
     United States Attorney
2    RAVEN NORRIS
     Assistant U.S. Attorney
3    California State Bar No. 232868
     Office of the U.S. Attorney
4    880 Front Street, Room 6293
     San Diego, California 92101-8893
5    Telephone: (619) 557-7157
     E-mail: Raven.Norris@usdoj.gov
6
     Attorneys for Defendants
7

8              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF CALIFORNIA
9

10   MOHAMED BAHRIZ                  )    Case No. 08cv0342-JM (NLS)
                                     )
11              Plaintiff,           )
                                     )    Declaration of Michael A. Cannon
12        v.                         )
                                     )
13   PAUL PIERRE, District Director, U.S. )
     Citizenship & Immigration Services, et al. )
14              Defendant.           )
                                     )
15   _____ )

16

17

18

19

20

21                      EXHIBIT E

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

Mohamed Bahriz,                         )
                                        )
                Plaintiff,              )
                                        )
        v.                              )       Case No: 08 CV 0342 JM NLS
                                        )
Paul Pierre,                            )
                et al.,                 )
                                        )
                Defendants.             )
                                        )

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program

Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in

Washington, D.C.  I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name

Check Units.  The statements contained in this declaration are based upon my personal

knowledge, upon information provided to me in my official capacity, and upon conclusions and

determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the policy

and the procedures of the United States Citizenship and Immigration Services ("USCIS").

Specifically, I am familiar with the name check request for Mohamed Bahriz, the plaintiff in this

civil action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS,

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

08cv0342_00032

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

    (a)    Investigative Case Management:  This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed.  The offices that receive the leads are referred to as Lead Offices.  When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

    (b)    Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents.  It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

    (c)    Universal Index:  This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices may index additional information as needed.  The Universal Index, which consists of an index of approximately 100.7 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases.  Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

08cv0342_00033

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

### RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name check: batch processing, name searching, dissemination, and file review. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. A "No Record" result returned to USCIS definitively concludes the name check process concerning that particular request. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

6

(14)    The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, an expanded manual name search is required. An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. This secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are dissemination and, if needed, file review. (Prior to February 2008, the file review stage preceded the dissemination stage. Because an increasing number of name check requests involve review of electronic records, and in an effort to improve efficiency, the FBI now uses the file review function in the back end of processing to locate paper records on an as needed basis.) As noted, the remaining 10 percent of USCIS requests are identified as possibly being the subject of an FBI record. Analysts in dissemination are responsible for reviewing and analyzing FBI records and providing results to customers. If a record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved through the file review process from an existing paper record. Once the information is retrieved, an analyst in dissemination reviews the records for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(16)    Apart from the aforementioned stages, a name check occasionally may undergo additional electronic or manual searches depending on the length of time the name check has been pending in the processing queue in the dissemination phase. It is very common for a name check to remain pending in this final stage for an extended period because of the volume of earlier-filed name checks, as well as expedited name checks, that analysts must resolve. During this period, a name check cannot be further processed until it is assigned to an analyst. The additional searches thus are done to ensure that the analyst in the dissemination phase has up to date information prior to completing and disseminating a name check result.

(17)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that name check request came in first, the name check may require additional time until all responsive records are located and reviewed.

(18)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. Based on its own criteria, USCIS determines which name checks are to be expedited. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(19)    Expedited service allows USCIS to allocate name checks toward its highest priorities and generally to minimize possible health and welfare harm to applicants that may arise while an application is pending. However, the FBI limits the number of expedite

8

requests it will accept from USCIS consistent with available resources and personnel, as well as because only a limited number of applications can be expedited for the process to remain meaningful as too many expedited requests would merely reorder the queue and lead to no net benefit. Thus, as it does with most customers, the FBI limits USCIS to 100 expedite requests per week.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (34) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2007, the FBI processed in excess of 4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2007, 52% (~2,113,000) of the total incoming name checks were submitted by USCIS.

9

## USCIS NAME CHECK REQUESTS

(23)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. Because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the

10

inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 630 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(26)    There are numerous factors that have contributed to delays in the processing of name check requests, including the name check for plaintiff. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for fiscal year 2007, USCIS submitted approximately 2,113,600 name check requests, of which approximately 1,112,400 represented naturalization-related name checks and approximately 794,800 represented adjustment of status-related name checks. As of the end of fiscal year 2007, the NNCPS had over 402,800 pending USCIS name check requests, of which over 167,000 represented naturalization-related name checks and over 197,900 represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

11

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995. the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30)    Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

12

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process. Over the short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)    NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)    The FBI is using overtime to maximize productivity. It is also in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload. The employee development program led to the development of a name check employee training manual.

13

(35)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations throughout the United States and the world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. Until recently, fees did not cover the

14

basic costs of providing the service. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee structure is undergoing the Federal rulemaking process. Consistent with this process, on October 1, 2007, the FBI began charging increased fees up front on an interim basis.

(39)    The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to complete the review once it has begun. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process

15

be primarily focused on providing accurate and thorough results. When the name check is
completed, the FBI provides the results to USCIS as quickly as possible. On occasion,
depending on the results provided to USCIS by the FBI, USCIS may require additional followup
and coordination with the FBI.

      (40)    Despite the constraints described above, the FBI's initiatives have yielded
positive results. For example, the total backlog of pending name checks requested by USCIS fell
during the first quarter of fiscal year 2008.

      (41)    It is important to note that the FBI does not adjudicate applications for
benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a
summary of available information to USCIS for its adjudication process.

## THE FBI DOES NOT PUBLICLY DISCLOSE NAME CHECKS RESULTS

      (42)    Plaintiffs occasionally request access to the documents examined during
their name checks. The FBI does not publicly disclose name check results or any underlying
"hits" because to do so could alert plaintiffs and/or other individuals to the existence of pending
investigations, thus potentially compromising those investigations, confidential sources or
investigative techniques. Through channels developed in the FBI's name check process, the FBI
discloses derogatory information only to USCIS before USCIS renders final decisions on
applicants' petitions. Moreover, the FBI cannot confirm that name check results reveal a person
is *not* the subject of an FBI investigative record, because a denial as to one person would imply
that silence as to others should be taken as confirmation that they are of investigative interest.

16

## PLAINTIFF'S NAME CHECK REQUEST

(43)    The USCIS has submitted the name check request for plaintiff Mohamed Bahriz to the FBI twice. The first name check request for plaintiff Mohamed Bahriz was received by the FBI from USCIS on or about April 9, 2004 and was completed on October 2, 2004. The FBI performed its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check were forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(44)    The second name check request for plaintiff Mohamed Bahriz was received by the FBI from USCIS on or about April 12, 2006 and has not been completed. Plaintiff's name check is pending in the processing queue and the FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 25 day of April 2008.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

17

1  KAREN P. HEWITT
   United States Attorney
2  RAVEN NORRIS
   Assistant U.S. Attorney
3  California State Bar No. 232868
   Office of the U.S. Attorney
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: (619) 557-7157
   E-mail: Raven.Norris@usdoj.gov
6
   Attorneys for Defendants
7

8              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF CALIFORNIA
9

10  MOHAMED BAHRIZ                    )    Case No. 08cv0342-JM (NLS)
                                      )
11            Plaintiff,             )
                                      )    Order Vacating Hearing and Remanding
12        v.                         )    Adjudication of Naturalization Application
                                      )
13  PAUL PIERRE, District Director, U.S. )
    Citizenship & Immigration Services, et al. )
14            Defendant.             )
                                      )
15  _____ )

16

17

18

19

20

21                        EXHIBIT F

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9            **UNITED STATES DISTRICT COURT**
10          **SOUTHERN DISTRICT OF CALIFORNIA**
11
12 LEI ZHOU,                      CASE NO. 07cv0102-LAB (NLS)

13               Plaintiff,     **ORDER VACATING HEARING**
      vs.                              **AND REMANDING**
14                                 **ADJUDICATION OF**
                                   **NATURALIZATION APPLICATION**
15 MICHAEL CHERTOFF, Secretary;
16 EMILIO GONZALEZ, Director; PAUL
PIERRE, District Director, Department of
17 Homeland Security, and ALBERTO
GONZALEZ, Attorney General,
18                   Defendants.

19       Lei Zhou ("Zhou"), proceeding through counsel, has filed a Complaint for a hearing

20 to decide her naturalization application. She represents she successfully passed her the

21 History and Government examinations on September 28, 2004, but the government

22 defendants have failed to timely adjudicate her application. She represents she has inquired

23 as to the status of her application at approximately six-month intervals since her

24 examination, receiving the response each time that Defendants continue to await "some kind

25 of background check or security check." Compl. ¶ 5.

26       Zhou's application for naturalization has been pending for over two years since her

27 initial examination. She is entitled to ask this court to take jurisdiction of the matter and to

28 decide her application judicially pursuant to 8 U.S.C. § 1447(b), setting a 120-day period

                07cv0102

08cv0342_00048

1  from the date of that examination within which the agency must decide a naturalization

2  application.[1]

> If there is a failure to make a determination under section 1446
> of this title before the end of the 120-day period after the date on
> which the examination is conducted under such section, the
> applicant may apply to the United States district court for the
> district in which the applicant resides for a hearing on the matter.
> Such court has jurisdiction over the matter and may either
> determine the matter or remand the matter, with appropriate
> instructions, to the Service to determine the matter.

8  8 U.S.C. § 1447(b).

9  In response to the court's Order To Show Cause regarding Zhou's Complaint, the

10  defendants filed responsive briefing, urging the court to "remand the matter, with appropriate

11  instructions" to the United States Citizenship and Immigration Services ("CIS") to adjudicate

12  the petition, rather than to itself decide the citizenship question. Resp. 2:1-12, *quoting* 8

13  U.S.C. § 1447(b). Defendants represent they are still awaiting the necessary background

14  check results from the FBI investigation in Zhou's case, and that any adjudication of her

15  naturalization application in this circumstance, whether by the court or by the agency, would

16  be based on an incomplete record. Defendants provide the declaration of Victoria Porto,

17  a CIS employee whose duty, among others, is to research and monitor CIS case records.

18  Resp. Ex. A, ¶ 1. She avers, among other things, she has investigated the possibility of

19  requesting expedition of Zhou's background investigation and has determined her application

20  does not qualify under December 21, 2006 USCIS guidelines. Resp. Ex. A, ¶ 12.

21  Zhou filed a Reply to the government's Response, opposing the remand option. She

22  argues she has done everything required of her, and if the matter were remanded, the

23  government would remain in complete control, as it has been throughout the delay since her

24  September 2004 examination. She also argues the government should be required to inform

---

26  [1]  Most courts have construed that period as commencing on the literal *date* of that
27  examination as a discrete event (rather than as a process incorporating the entire investigative
activity), consistent with the statutory text according district court jurisdiction 120 days after "the date
on which the examination is conducted." 8 U.S.C. § 1447(b). Courts have also supported that
28  construction through inferences from the organization of 8 U.S.C. § 1446, implying that the
"investigation" of the applicant is separate from the "examination" of the applicant.

07cv0102

1   the court if anything has surfaced in the course of the investigation that could justify a failure
2   to conclude her case. As there appears to be nothing, she argues the court should accept
3   jurisdiction and decide her application.

4          Pursuant to Civil Local Rule 7.1(d)(1), the court finds the issues presented appropriate
5   for decision on the papers and without oral argument. Accordingly, the March 19, 2007
6   hearing is **VACATED**. For the reasons discussed below, the court declines to adjudicate
7   Zhou's application in the absence of a completed security investigation and **REMANDS** her
8   naturalization proceedings to the CIS

9          The FBI and CIS are charged with investigating and adjudicating naturalization
10  applications. 8 U.S.C. § 1446(a). Congress mandated in 1997 that the FBI investigate every
11  applicant for naturalization and that CIS await completion of those investigations before
12  rendering a decision with respect to any applicant. *See* Pub. L. No. 105-119, Title I, Nov.
13  26, 1997, 111 Stat. 2448. In particular, beginning in fiscal year 1998 and thereafter, the then
14  Immigration and Naturalization Service ("INS") (now CIS) is prohibited from using any of the
15  funds appropriated or available to it "unless the [CIS] has received confirmation from the
16  (FBI) that a full criminal background check has been completed . . . ."[2] Id. Pursuant to that
17  provision, the INS amended 8 C.F.R. § 335.2 to reflect the need to delay conducting an
18  applicant's initial citizenship interview until after the FBI completes its investigations. The
19  government respondents here, and in a number of similar cases before this and other district
20  courts, acknowledge:

                    Until recently, many CIS offices, including the San Diego
21                  office, had acted contrary to the regulation by conducting an
                    initial interview of the applicant to conduct the history and
22                  English examinations before awaiting the results of the FBI
                    investigations.    Depending upon the results of the FBI
23

24  _____

25      [2]  "A definitive response that a full criminal background check on an applicant has been
    completed **includes**: (1) Confirmation from the Federal Bureau of Investigation that an applicant
26  does not have an administrative or criminal record; (2) Confirmation from the Federal Bureau of
    Investigation that an applicant has an administrative or criminal record; or (3) Confirmation from the
27  Federal Bureau of Investigation that two properly prepared fingerprint cards (Form FC-258) have
    been determined unclassifiable for purpose of conducting a criminal background check and have
28  been rejected." 8 C.F.R. § 335.2(b) (emphasis added). This court, like others, finds a "name check"
    is reasonably read into the requirement of a "full criminal background check" based on the non-
    limiting term "includes."

08cv0342_00050

1    investigation, CIS would interview the naturalization applicant.
     However, FBI investigations have taken much longer over the
2    past few years, so the adjudications of naturalization
     applications have been increasingly delayed.    Accordingly,
3    applicants have turned to 8 U.S.C. § 1447(b).

4    Resp. 3:28-4:5.

5         When CIS proceeded with the initial examinations of applicants before receiving the

6    results of the required FBI investigations, it prematurely triggered the 120-day decision

7    period. *See* Khelifa v. Chertoff, 433 F.Supp.2d 836, 841-42 (E.D.Mich. 2006) ("[T]he court

8    concurs in the weight of authority holding that the 120-day statutory decision making period

9    commences when an applicant 'appears in person before a Service officer' as provided in

10   the CIS regulation that governs examinations. 8 C.F.R. § 335.2"), *citing* El-Daour v. Chertoff,

11   417 F.Supp.2d 679, 683 (W.D.Pa. 2005) (concluding that "examination" means "interview");

12   *see also* Shalabi v. Gonzales, 2006 WL 3032413 (E.D. Mo. Oct. 23, 2006); Stepchuk v.

13   Gonzales, 2006 WL 3361776 *2 (W.D. Wash. Nov. 17, 2006) ("The Court agrees with this

14   persuasive authority and similarly concludes that the 120-day period in § 1447(b)

15   commences on the day of the applicant's examination interview with a USCIS officer").  To

16   avoid the problem in future, CIS has now conformed its interview process to the regulatory

17   timing mandate by awaiting completion of the FBI background investigations -- over the

18   timing of which CIS has no control -- before conducting initial interviews of naturalization

19   applicants. Id. 4:11-14.

20        However, a number of applicants, including Zhou, remain among those whose initial

21   examinations occurred before the procedure to await FBI investigation results was strictly

22   applied.  The district court has technical jurisdiction over cases like hers, where more than

23   120 days have passed since the CIS' initial examination of the applicant but where the

24   processing of his citizenship application is stalled pending the results of the FBI's

25   investigations.  *See* United States v. Hovsepian, 359 F.3d 1144, 1164 (9th Cir. 2004)

26   (holding "Section 1447(b) allows the district court to obtain exclusive jurisdiction over those

27   naturalization applications on which the INS fails to act within 120 days if the applicant

28   properly invokes the court's authority").  Once jurisdiction is established, 8 U.S.C. § 1447(b)

- 4 -

1   gives the court two options: hold a hearing and decide the matter, or remand the matter with

2   appropriate instructions to the CIS for determination. Prudentially and practically, this court

3   is persuaded to exercise its remand option rather than itself to adjudicate the application on

4   incomplete information.

5          "Generally speaking, a court . . . should remand a case to an agency for decision of

6   a matter that statutes place primarily in agency hands." INS v. Ventura, 537 U.S. 12, 16

7   (2002). In immigration matters, the executive branch is accorded great deference, as

8   evidenced by the statutory and regulatory schemes established for processing citizenship

9   applications. Neither the CIS nor the district court is sufficiently informed to decide an

10  application until the FBI completes the required criminal background check to determine

11  whether an applicant presents any national security or public safety risk, nor are they

12  equipped to conduct such investigations themselves. See El-Daour, 417 F.Supp.2d at 684;

13  Shalabi, 2006 WL 3032413 at *4. When the delay in the citizenship decision results from

14  the FBI's investigative process, this court finds it is inappropriate to make a determination

15  before that information is known, absent abusive or egregious circumstances not present on

16  this record. See Khelifa, 433 F.Supp.2d at 843 ("[T]he courts have been unwilling to pursue

17  either of these two courses [i.e., either to conduct their own investigations into an applicant's

18  criminal background, or to proceed to the merits of the application without the benefit of

19  information concerning the applicants' backgrounds or security risks] where they could

20  instead remand with instructions for the CIS to promptly decide the applications"). To do

21  otherwise, "we would be improvidently bypassing the agency's expertise in immigration

22  matters committed in the first instance to the agency." Lopez v. Ashcroft, 366 F.3d 799, 807

23  (9th Cir. 2004). Moreover, as "only the FBI and the CIS are in a position to know what

24  resources are available to conduct the background checks and whether an expedited

25  background check is feasible or efficient" in a particular case (Shalabi, 2006 WL 3032413

26  at *5), the court declines to impose particular deadlines for the completion of the FBI checks

27  or the naturalization decision. The court notes this decision does not deprive Zhou of judicial

28  review, because if her application is ultimately administratively denied, she may return to

- 5 -

1 | court for a *de novo* review. *See* 8 U.S.C. § 1421(c). The court would, at that time, have the

2 | benefit of a final and complete administrative record.

3 |      For the foregoing reasons, **IT IS HEREBY ORDERED**:

4 |      1.    This matter is **REMANDED** to CIS, with instructions that CIS make a

5 | determination as expeditiously as possible after the completion of Zhou's security and

6 | background investigation.

7 |      2.    The scheduled hearing of this matter is **VACATED**.

8 | **IT IS SO ORDERED**.

9 | DATED: March 13, 2007

10

11 | *Larry A. Burns*

    **HONORABLE LARRY ALAN BURNS**
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07cv0102

08cv0342_00053

1  KAREN P. HEWITT
   United States Attorney
2  RAVEN NORRIS
   Assistant U.S. Attorney
3  California State Bar No. 232868
   Office of the U.S. Attorney
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone:  (619) 557-7157
   E-mail: Raven.Norris@usdoj.gov
6
   Attorneys for Defendants
7

8              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF CALIFORNIA
9

10  MOHAMED BAHRIZ                    )    Case No. 08cv0342-JM (NLS)
                                      )
11              Plaintiff,            )
                                      )    Order Granting Defendant's Motion to Dismiss
12       v.                           )    Plaintiff's Complaint
                                      )
13  PAUL PIERRE, District Director, U.S. )
    Citizenship & Immigration Services, et al. )
14              Defendant.            )
                                      )
15  _____  )

16

17

18

19

20

21                        EXHIBIT G

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

### UNITED STATES DISTRICT COURT

9

### SOUTHERN DISTRICT OF CALIFORNIA

10

11

ROBERT YASMEH,

12

                             Plaintiff,

13

      vs.

14

MICHAEL MUKASEY, Attorney
General of the United States;

15

MICHAEL CHERTOFF, Secretary of
the Department of Homeland Security;

16

EMILIO T. GONZALEZ, Director of
the United States Citizenship and

17

Immigration Services; ALFONSO
AGUILAR, Chief of Citizenship,

18

United States Citizenship and
Immigration Services; PAUL M.

19

PIERRE, District Director of the
United States Citizenship and

20

Immigration Services, San Diego,
California; ROBERT S. MUELLER,

21

III, Director of the Federal Bureau of
Investigation,

22

                        Defendants.

23

CASE NO. 08-CV-0024 H (JMA)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

24

     On January 4, 2008, plaintiff Robert Yasmeh ("Plaintiff") filed a complaint

25

against defendants Michael Mukasey, Attorney General of the United States; Michael

26

Chertoff, Secretary of the Department of Homeland Security; Emilio T. Gonzalez,

27

Director of the United States Citizenship and Immigration Services; Alfonso Aguilar,

28

Chief of Citizenship, United States Citizenship and Immigration Services; Paul M.

- 1 -

1 Pierre, District Director of the United States Citizenship and Immigration Services, San

2 Diego, California; and Robert S. Mueller, III, Director of the Federal Bureau of

3 Investigation (collectively "Defendants"). Plaintiff's complaint seeks an order from this

4 Court requiring Defendants to expedite Plaintiff's pending naturalization application.

5 (Doc. No. 1.) On March 4, 2008, Defendants filed a motion to dismiss. (Doc. No. 4.)

6 On March 25, 2008, the Court submitted Defendants' motion and vacated the April 1,

7 2008, hearing. (Doc. No. 5.) The Court exercises its discretion pursuant to Local Civil

8 Rule 7.1(d)(1) to decide this matter without oral argument. For the following reasons

9 the Court **GRANTS** Defendants' motion to dismiss.

10

11 ### Background

12     Plaintiff, a native and citizen of Iran, entered the United States as a refugee in

13 1980. (Compl. ¶ 10.) On October 1, 1985, Plaintiff was granted Lawful Permanent

14 Resident status. (Id.) On April 11, 2006, Plaintiff filed an application for

15 naturalization. (Id. ¶ 12.) Plaintiff was fingerprinted for security checks on May 17,

16 2006. (Id. ¶ 13.) The USCIS and FBI have not yet completed Plaintiff's background

17 security check. (Id. ¶ 15.) Because the USCIS has not completed the name check

18 request, USCIS has not yet scheduled a naturalization interview for Plaintiff.[1] (Id.)

19

20 ### Discussion

21     Federal courts are courts of limited jurisdiction and the burden of establishing

22 that federal jurisdiction exists rests with the party asserting jurisdiction. See Kokkonen

23 v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994). Rule 12(b)(1) of the

24 Federal Rules of Civil Procedure allows a defendant to bring a motion to dismiss a

25 claim because the court lacks jurisdiction over the subject matter. Fed. R. Civ. P.

26

---

27     [1] The Court notes that Plaintiff states that an interview took place on October 18, 2005.
(Compl. ¶ 20.) However, Plaintiff states elsewhere that USCIS "has not scheduled him for an
interview." (Id. ¶ 15.) Defendants also state that USCIS has not interviewed Plaintiff. (Rangaswamy

28 Decl. ¶ 19-21.) Furthermore, Plaintiff did not file the currently pending application until April 11,
2006, several months after the date of the alleged interview. (Compl. ¶ 12.)

08cv0024

08cv0342_00056

1  12(b)(1).

2

3  **A.    Mandamus Jurisdiction**

4         "The district courts shall have original jurisdiction of any action in the nature of

5  mandamus to compel an officer or employee of the United States or any agency thereof

6  to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  "Mandamus is an

7  extraordinary remedy and is available to compel a federal official to perform a duty

8  only if: (1) the individual's claim is clear and certain; (2) the official's duty is

9  nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3)

10 no other adequate remedy is available." Kildare v. Saenz, 325 F.3d 1078, 1084 (9th

11 Cir. 2003).  Litigants may seek a writ of mandamus "to compel action, when refused,

12 in matters involving judgment and discretion, but not to direct the exercise of judgment

13 or discretion." Idaho Watersheds Project v. Hahn, 307 F.3d 815, 832 (9th Cir. 2002)

14 (quoting Miguel v. McCarl, 291 U.S. 442, 451 (1934)).  Mandamus may also be

15 available where "a public official has violated statutory or regulatory standards

16 delimiting the scope or manner in which official discretion can be exercised."

17 AlliedSignal, Inc. v. City of Phoenix, 182 F.3d 692, 697 (9th Cir. 1999).

18        The Court concludes that section 1361 does not confer subject matter jurisdiction

19 over Plaintiff's claim. The actions Plaintiff seeks to compel are discretionary, not

20 ministerial.  Defendants have not refused to take action on Plaintiff's application or

21 exceeded a statutory or regulatory standard delimiting the scope of their discretion.

22 Congress has not established any time limits for the USCIS or FBI to conduct the

23 background investigations required under 8 U.S.C. § 1446.  Federal regulations also

24 provide no time frame within which USCIS must act on an application for

25 naturalization. See 8 C.F.R. § 335.1.  On the contrary, section 1446 indicates that

26 Congress intended the executive branch and the relevant agencies to have broad

27 discretion in the manner in which they process naturalization applications.   For

28 example, the statute provides that "[t]he Attorney General may, in his discretion, waive

1    a personal investigation" in an individual case or class of cases.  8 U.S.C. § 1446(a)
2    (emphasis added).

3         Furthermore, Congress has established a 120-day time frame for USCIS to make
4    a determination on a naturalization application once it has completed the requisite
5    background investigation and interviewed an applicant.  8 U.S.C. § 1447(b).  This
6    section provides the applicant the right to a hearing before a district court if USCIS fails
7    to "make a determination under section 1446 of this title before the end of the 120-day
8    period after the date on which the examination is conducted." Id.  The absence of such
9    a time frame delimiting the pace of Defendants' action before the interview occurs,
10   including conducting the required security checks, indicates that the pace of such action
11   is within the discretion of the relevant agencies.

12        Defendants have provided the declaration of Janaki Rangaswamy, the
13   Supervisory Center Adjudications Officer of USCIS's California Service Center.
14   (Rangaswamy Decl. ¶ 1.)   Rangaswamy declares that Plaintiff's naturalization
15   application requires the completion of an FBI name check, FBI fingerprint check, and
16   the Department of Health Services-managed Interagency Border Inspection System.
17   (Id. ¶ 6.)  These checks must be complete before USCIS may schedule an applicant for
18   an examination.  See 8 C.F.R. § 335.2(b).  The FBI processes USCIS name check
19   requests in the order in which USCIS transmits them to the FBI.  (Rangaswamy Decl.
20   ¶ 7.)  Delays in processing applications are unavoidable and may be lengthy.  (Id. ¶ 9.)
21   Some cases involve complex or highly sensitive information and cannot be resolved
22   quickly.  (Id. ¶ 6.)  Sometimes a name check will reveal the existence of information
23   about the applicant without revealing the nature of that information.  In such cases, the
24   USCIS must work closely with the other agencies to obtain all the relevant information
25   and ascertain its significance.  (Id. ¶ 9.)  Furthermore, the large number of name check
26   requests USCIS has submitted to the FBI since the terrorist attacks of September 11,
27   2001, along with new heightened screening procedures, have created a backlog and
28   slowed the FBI's completion of the name check requests.  (Id. ¶ 7; see Decl. of Michael

08cv0024

08cv0342_00058

1    A. Cannon ISO Defendants' Mot. ¶¶ 21-23.)  Rangaswamy states that the USCIS has

2    yet to receive the results of Plaintiff's name check from the FBI and therefore cannot

3    complete the processing of Plaintiff's application.  (Rangaswamy Decl. ¶ 19.)

4         Based on the foregoing the Court concludes that this is not a case where an

5    agency declines or refuses to act.  Plaintiff's only grievance is that Defendants have not

6    acted expeditiously enough.  The evidence establishes that the requisite investigation

7    is ongoing. (See Rangaswamy Decl. ¶¶ 19-21.)  Defendants simply do not yet have all

8    of the necessary information to adjudicate Plaintiff's application.  (Id.)  USCIS states

9    that once it has the information it will promptly process Plaintiff's application.  (Id. ¶

10   21.)  The Court concludes that the pace of the investigation and adjudication process

11   before an interview occurs is discretionary and, therefore, that Defendants do not owe

12   a ministerial duty to expedite the processing of Plaintiff's application.  Accordingly,

13   this Court does not have subject matter jurisdiction over Plaintiff's mandamus petition

14   under section 1361.

15

16   **B.     Plaintiff's Claim Under the APA**

17        The APA provides that, "with due regard for the convenience and necessity of

18   the parties or their representatives and within a reasonable time, each agency shall

19   proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).  Also, "[a] person

20   suffering legal wrong because of agency action, or adversely affected or aggrieved by

21   agency action within the meaning of a relevant statute, is entitled to judicial review

22   thereof." Id. § 702. This includes judicial review to "compel agency action unlawfully

23   withheld or unreasonably delayed." Id. § 706(1).  Plaintiff argues that Defendants have

24   failed to complete processing of Plaintiff's naturalization application within a

25   reasonable time and request an order compelling Defendants to expedite the processing

26   and adjudication of Plaintiff's application.

27        "Failures to act are sometimes remediable under the APA, but not always."

28   Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 61 (2004).  "[A] claim

- 5 -

1  under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take

2  a <u>discrete</u> agency action that it is <u>required to take</u>." <u>Id.</u> at 64 (emphasis in original).

3  This limitation rules out judicial direction of even discrete agency action that is not

4  demanded by law or agency regulations having the force of law.  <u>See id.</u> at 65.

5  Therefore, under the APA a court may not compel an agency to act within a certain time

6  unless the agency is compelled by law to act within a specified period of time or the

7  delay is unreasonable.  <u>Id.</u>; <u>see</u> <u>Coit Independence Joint Venture v. Federal Sav. and</u>

8  <u>Loan Ins. Corp.</u>, 489 U.S. 561, 590 (1989) (Scalia, J., concurring).

9       Here, no statute or regulation specifies a time period within which USCIS must

10  act with respect to the FBI name check and related background investigation. <u>Compare</u>

11  Pub. L. No. 108-458, § 3001(g), 118 Stat. 3638 (2004) (requiring personnel security

12  checks to be completed within a certain time frame).  Additionally, Plaintiff has not

13  pointed to any statute or regulation that requires the FBI to complete the name check

14  in any period of time.  The 120 day time limit for USCIS to make a determination on

15  an application from the date of the interview does not apply here because USCIS has

16  not yet scheduled an interview for Plaintiff.

17       Therefore, the only governing time limit is the APA's directive that agencies

18  resolve matters presented to them within a reasonable time.  5 U.S.C. § 555(b).  This

19  provision clearly affords wide discretion to USCIS and the FBI regarding the pace of

20  the investigation component of adjudicating naturalization applications. <u>Cf.</u> <u>Wright v.</u>

21  <u>Califano</u>, 587 F.2d 345, 353-54 (7th Cir. 1978) ("Since administrative efficiency is not

22  a subject particularly suited to judicial evaluation, the courts should be reluctant to

23  intervene in the administrative adjudication process, absent clear congressional

24  guidelines or a threat to a constitutional interest.").  Accordingly, the Court concludes

25  that the APA does not provide subject matter jurisdiction over Plaintiff's claim seeking

26  to expedite processing of his naturalization application.

27  / / / /

28  / / / /

- 6 -

08cv0342_00060

1               **Conclusion**

2          For the reasons discussed, the Court **GRANTS** Defendants' motion to dismiss

3     Plaintiff's complaint.

4     IT IS SO ORDERED.

5     DATED:  April 1, 2008

6                                    _Marilyn L. Huff_

7                                    MARILYN L. HUFF, District Judge
                                     UNITED STATES DISTRICT COURT

8

9     COPIES TO:
      All parties of record.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08cv0024